## STATE OF MISSOURI, Respondent, v. CLEO BURTON, Appellant.

### Kansas City Court of Appeals, June 2, 1913.

1. CRIMINAL LAW: Wife Abandonment: Elements of Crime. To constitute one guilty of the offense of wife abandonment the evidence must show that the abandonment was without good cause and the criminal intent to abandon and to fail to support the wife must clearly appear.

2. ———: ———: Evidence. Where the evidence showed no unpleasant feeling between husband and wife and no intent on the part of the former to abandon the latter, the mere fact that the husband failed to keep his promise to come after his wife, who was on a visit to her father's home, coupled with the fact that the husband went off on a visit himself without notifying his wife where he was going, will not justify a conviction of wife abandonment where the wife was in her husband's home tenderly cared for by her husband's parents, and within a week after the husband's leaving the wife left her

husband's home and replevined and took away the furniture given them by her father-in-law, and expressed a determination not to live with her husband again. In such case there is no evidence of the criminal intent to abandon and fail to support her.

Appeal from Daviess Circuit Court.—*Hon. Arch B. Davis,* Judge.

REVERSED.

*John C. Leopard* and *Wilson & Wilson* for appellant.

(1)   The record in this case is wholly insufficient to support the verdict because the information fails to allege the county and State where the abandonment of the prosecutrix took place.   There is no venue stated in the margin as required by section 5107, Statutes of 1909.   The words ''State of Missouri, county of Daviess, ss.,'' must appear in the margin to cure the defect of failure to allege the venue in the body of the information.   The defendant's instruction in the nature of a demurrer to the evidence offered at the close of plaintiff's case should have been given.   The evidence fails to show any criminal intent on the part of defendant or any intention whatever to abandon his wife, and further fails to show that defendant failed, neglected or refused to maintain and provide for such wife.    State v. Doyle, 68 Mo. App. 219; State v. Fuchs, 17 Mo. App. 458; State v. Lasley, 151 S. W. 752.   (2) The verdict of the jury is against the evidence because two elements are necessary to constitute the criminal offense of wife abandonment.   The evidence must show beyond a reasonable doubt that the abandonment was without good cause and with criminal intent, and that the defendant also, with criminal intent, failed to provide for his wife.   The evidence in this case wholly fails to show that the defendant abandoned his wife at all, and fails to show a

failure to provide for her. On the contrary the evidence shows that the prosecuting witness was provided with a "good home" and with "plenty to eat" and that she "had never said anything to him about clothing but that he was intending to get her clothing at Easter time but that she left before that." If, then, there is any abadonment in this case the evidence shows that the prosecutrix abandoned defendant instead of defendant abandoning her. State v. White, 45 Mo. 512; State v. Brinkman, 40 Mo. App. 284; State v. Bruening, 60 Mo. App. 55; State v. Greenup, 30 Mo. App. 299; State v. Lasley, 151 S. W. 752.

*George B. Padget* for respondent.

It is not necessary to allege the venue in the body of the information; the venue is sufficiently laid in the caption and margin of the information, which will be taken, to be the venue for all the facts stated in the body of the information; and if the court should hold there is a defect, it is cured by the Statute of Jeofails. On this point see sections 5107, 5115 and 2119, R. S. 1909; State v. Hughes, 82 Mo. 86; State v. Simon, 50 Mo. 370; State v. Hunt, 190 Mo. 358 and refers to caption; State v. Dawson, 90 Mo. 149; State v. McDonough, 232 Mo. 227, 228.

TRIMBLE, J.—Defendant was convicted of wife abandonment and his punishment fixed at a fine of $500 and six months' imprisonment in the county jail. At the time of his marriage he was a young man not quite of age and his wife was nineteen.

The statute under which he was prosecuted is section 4495, Revised Statutes of Missouri 1909, as amended by Session Acts 1911, page 193. It provides that "If any man shall, *without good cause,* abandon or desert his wife, . . . *and* shall fail, neglect or refuse to maintain and provide for such wife, . . .

he shall . . . be punished, etc." To constitute the crime specified in this statute, there must be abandon- ment *and* failure to support or provide for the wife. The statute was not enacted to secure to wives the blessings and comforts arising from the constant and uninterrupted society of their husbands, but to pre- vent wives from being deserted and left destitute and in want, and liable to become burdens on the State be- cause of the husband's violation of his marital and civic duties. Moreover, the abandonment must be without good cause and the criminal intent to abandon must be clearly shown. And the crime must be established beyond a reasonable doubt.

The prosecutrix and defendant, after their mar- riage, went to keeping house in Pattonsburg and re- mained there for two months until, on account of the extreme cold weather and the uncomfortable condition of the house they were in, they moved the larger part of their furniture to the home of defendant's father and mother. The parents were seemingly well-to-do people living on a farm, and it was entirely agree- able to them, as well as to the young couple, that this arrangement should be made. The young folks were to live there temporarily until the husband could make a home. The intention was to move to Kansas as soon as that arrangement could be made. While they lived thus with the old folks the latter furnished the pro- visions, which were ample and satisfactory, and to which no objection was made by anyone. The old folks treated the wife kindly and all of them got along with- out trouble of any kind. No trouble, or complaint or disagreement of any kind arose between the young hus- band and wife.

On March 2, the wife took some sewing and went to her mother's to make a visit of several days. No time was fixed for her return. The roads were ex- tremely muddy and it was "considerable trouble to go backwards and forwards so much" to use the wife's

language. Her husband told her when she got ready
to come back to call him up over the phone and he
would come for her. They were both pleasant and
kindly to each other, no talk or hint of separation of
any kind. This was on Thursday. On Sunday, the
wife called him, and also on Monday and Tuesday.
The first two times she called he gave some excuse
for not coming, which was satisfactory to her, either
the condition of the roads, which were still very muddy,
or something else. And on Tuesday he told her he
would come after her that afternoon "if the roads
drain off." The husband and wife were seven or eight
miles apart. He did not come, however, and she re-
turned to her husband's home two days later but her
husband was away. The old folks treated her kindly
as before and she took her place in the home as usual.
She asked where her husband was and the mother said
she did not know. But no further inquiry was made
by the wife as to his whereabouts. This was on the
9th of March. The old folks treated her well and they
got along all right. The young wife, being pregnant,
became sick and the mother-in-law waited on her, car-
ried her meals to her when she was not able to go to the
table, took care of her and did the best she could for
her. The old gentleman sent for a doctor to come and
see her while she was sick, and he came and left her
medicine. The wife says she "supposes" the old gen-
tleman paid the bill. On the 14th of March, which was
the following Tuesday, she wanted to return to her
mother's although nothing had been said to her by her
husband's folks about going, and they had never said
or done anything to hurt or offend her but had cared
and provided for her. She told the old folks she was
going, and went with defendant's brother in-law, Rollo
Utz, to her mother's home. About the Saturday fol-
lowing, or at least between the 14th of March, when
she left her husband's home, and the 20th of that
month, she consulted a lawyer at Pattonsburg in ref-

erence to replevining the furniture and household goods in the room she and her husband had occupied at the home of the old folks. Acting on the advice she received, she went back on the 20th and demanded these goods. (These had been given to the young couple by the old gentleman when they were first married). The old gentleman told her she could have part of them— the rugs, table and dresser—and that if she thought she was treating him right, she could have the rest of them. The young wife says he didn't seem to want to give her all of them, so she said no more about it that evening. She left, and the next day obtained a writ and went down to the old man's with an officer and got all the goods. There was no row about it. She was allowed to take them. That same evening, after the prosecutrix had left with the goods, her husband came back on the five o'clock train to Pattonsburg and was waiting to go out to his father's. His wife heard that evening he had returned and that he was in Pattonsburg, but made no effort to communicate with him; nor did she afterwards. She "didn't feel like it was her duty to call him." And, although she saw him in Pattonsburg afterwards, she did not speak to him, or ask him to live with her, nor afterwards notify him of the child's birth. She testified that she met him on the street and passed right by him but did not speak to him. "I did not say anything to him, because I thought he ought to speak to me first. That is the reason I didn't speak to him. I didn't intend to humble myself to speak to him. I didn't think it was my place. I thought it was his place to come to me. I thought he could have wrote to me or let me know when he went visiting. I think I seen him every time I went to Pattonsburg after that. I never went back to the home he had prepared for me at his father's. I never wrote to him, or said anything, or asked him to come and see me. I had done that many times before we were married, but I didn't have to afterwards."

Her complaint seems to be that her husband went visiting without telling her of his going, and that, although she went away from home in his absence and then within a week replevined the furniture given both of them by his father, still it was the husband's duty to hunt her up and not her's to say anything to him. She was asked:

Q. "Do you love this man? Do you want to live with him? A. No, sir; I don't. Q. No, you don't? A. No, sir. Q. Do you want him to help raise the baby? A. I would like to have him support it. Q. Don't you want him to live with you and you and he raise this baby? A. No, sir. He can support it if he wants to. Q. You are not willing that he live with you and her and help raise the child? A. No. Q. Why? A. The way he has done. Q. You have told the jury what he has done? A. Yes, sir. Q. Did he do anything you have not told the jury? A. No, sir. Q. It is all based on that? A. Yes, sir. Q. And you are not willing that he should live with you and the baby? A. He can support her if he wants to. Q. You are not willing to go back to his old father's and mother's where you were, and live there, *or go in a house by yourself and live with him, and raise the child? A. No, sir.*"

The facts hereinabove given show clearly that the evidence is wholly insufficient to constitute the crime at which the statute is aimed. [State v. Doyle, 68 Mo. App. 219; State v. Lasley, 151 S. W. 752; State v. Fuchs, 17 Mo. App. 458; State v. Brinkman, 40 Mo. App. 248.] Defendant's demurrer to the evidence should, therefore, have been sustained.

It may be that the defendant failed to show that finer and more tactful consideration for his bride that he should have displayed. He may not have known exactly how a young and sensitive woman should be treated. Where is the young husband who does know? But if he doesn't, it does not follow that he shall be

fined and put in jail on that account. The statute is aimed at the worthless wretch who vows to cherish and care for a woman and then, heartlessly and without cause, leaves her in her helplessness to the cold charity of the world. Against such, the statute should be more thoroughly enforced than it is; but it was not passed for the purpose of putting a club in the hands of one of a couple who cannot agree. Judgment reversed, and defendant discharged. All concur.